[No. F002645. Fifth Dist. Oct. 2, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
VICK HERNANDEZ, Defendant and Appellant.

728

**COUNSEL**

John Francis Bowman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, James T. McNally and James Ching, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ARDAIZ, J.**\*—The facts in the instant case are not in contention in this appeal which is directed at the validity of the sentencing. A brief statement of the facts, however, is necessary for an understanding of the issues arising out of the sentencing hearing.

On March 16, 1983, at 12:41 a.m., appellant Hernandez robbed the Adult World Bookstore. The robbery was effectuated with the use of a knife. The total taken by the robbery was approximately $130 in cash. Approximately one hour later, Hernandez entered a 7-Eleven store. Again, Hernandez was armed with a knife and effectuated a robbery. The second robbery netted Hernandez approximately $50 in cash. In getting away from the 7-Eleven

---

\*Assigned by the Chairperson of the Judicial Council.

store, Hernandez was seen leaving in a vehicle which had the left taillight lens broken out. The clerk called the Modesto Police Department and described Hernandez and the car.

At approximately 2:30 a.m. on the same date, a Modesto police officer observed the vehicle. The vehicle was stopped and Hernandez was arrested. When he was arrested, Hernandez was in possession of three $1 bills.

At the Modesto Police Department, Hernandez admitted his involvement in the robberies. He claimed, however, that one Gregory Wagner had driven to each of the stores and provided him with a knife to commit the robberies. Subsequently, Wagner was taken into custody and was found to have $173 in cash in his possession. The charges against Wagner were dismissed for insufficient evidence on March 25, 1983.

On April 11, 1983, an information was filed in Stanislaus County alleging two counts of violation of Penal Code section 211 with the further allegation that Hernandez had used a knife in committing the robberies in violation of Penal Code section 12022, subdivision (b).

On May 12, 1983, Hernandez pled guilty to both counts and admitted use of the knife as charged.

On June 10, 1983, Hernandez had a sentencing hearing before Judge Azevedo of the Stanislaus County Superior Court. At the sentencing hearing of June 10, appellant was present with his counsel, the district attorney was present and the probation department was represented. At the sentencing hearing of June 10, the court made a number of statements which give rise to the basis for this appeal. The court initially noted at the June 10 sentencing hearing that appellant was not eligible for probation[1] because of the admission of a knife use during a robbery. The district attorney argued for the midterm on count I, a Penal Code section 211 violation, plus one year for the use of the knife and one year consecutive on count II for a total of five years. The probation officer's report alleged the following factors in aggravation: (1) California Rules of Court, rule 421(a)(1),[2] that the crime involved a threat of great bodily injury; (2) rule 421(a)(2), that appellant was armed with a deadly weapon at the time of the commission of the offense; (3) rule 421(b)(2), that appellant had numerous adjudications as a

---

[1] This is a technically incorrect statement. Penal Code section 1203, subdivision (e), provides that with respect to a violation of Penal Code section 211 while armed with a knife, "Except in unusual cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted . . . ."

[2] Unless otherwise indicated, all citations to rules refer to California Rules of Court.

juvenile for criminal violations. The probation office found no factors in mitigation in its report.

In response to arguments from defense counsel, the court struck the rule 421(a)(1) factor in aggravation and found that the facts did not support a threat of great bodily injury. The court ruled that rule 421(a)(2) *would not* be used as a factor in aggravation but only to enhance. The court stated it *would use* rule 421(b)(2) as a factor in aggravation (the extensive juvenile record). The appellant requested that the court find as a factor in mitigation that he was coerced pursuant to rule 423(a)(4) which was denied. Appellant also requested application of rule 423(a)(5), contending that the defendant had no apparent predisposition to commit the crime and was induced by others to participate, which was granted by the court. Appellant requested application of rule 423(b)(2) that he was suffering from a physical and mental condition at the time of the offense (intoxicated) which was granted by the court. The appellant requested application of rule 423(b)(3), contending there was an early admission of the crime and a plea which was granted by the court. Appellant requested application of rule 423(b)(4) that appellant would have been given probation except that he was statutorily ineligible.

"MR. COLE [defense counsel]: And next to last, 423(b)(4), the defendant would have been given probation but for the fact of being ineligible as a factor in mitigation. I think that applies in this case.

"THE COURT: Yeah, it does. All right, anything else?"

Appellant then argued that the court did not have the power to sentence appellant to a consecutive term, citing *People* v. *Anjell* (1979) 100 Cal.App.3d 189 [160 Cal.Rptr. 669].[3] Appellant argued that the court had to sentence appellant to two years (the mitigated term) plus one year (Pen. Code, § 12022, subd. (b)) as an enhancement and a concurrent sentence on count II pursuant to *Anjell, supra.* The court indicated a lack of familiarity with *Anjell* and set the sentencing over to the following Monday, June 13, 1983.

On June 13, 1983, court reconvened with all parties present, except there was another public defender representing appellant. The court, at the outset, noted that it had made a statement that the enhancement would be stricken as a factor in aggravation because it could not be used to enhance and aggravate. The court stated it would withdraw its previous comment with respect to striking the enhancement and that the arming allegation would be used to aggravate. The court stated as its reason that the enhancement *could*

---

[3]This was apparently in reference to rule 425(a)(3), but it was not specifically referred to.

*be* used as a factor in aggravation or as an enhancement and that the court had not yet decided which it would use the arming allegation for. The court noted that it could not use the arming allegation to both enhance and aggravate. The court then referred to *Anjell, supra,* and indicated that it had read the *Anjell* case. The court further stated that the *Anjell* case stood for the proposition that a sentencing judge must state reasons for sentencing consecutively on facts similar to the instant case and did not stand for the proposition that the court could not impose consecutive sentences. This was a correct statement of the holding in *Anjell, supra.*[4]

At this point, the court made the following statement concerning the *Anjell* case: "So that the record is entirely clear here, I personally called on Friday afternoon, the sentencing judge in that case, Judge Channell, C-h-a-n-n-e-l-l, of the Contra Costa Superior Court, and discussed the case with him, and he advised me that he sentenced the defendant in the first instance, it was reversed. When it came back down, he resentenced the defendant in exactly the same fashion except this time he stated on the record all of his reasons for what he was doing and it was his judgment that that's what the case requires, and the case was never appealed thereafter, so apparently, everybody was satisfied.

"Now, that the record is clear here, I do not believe that *People* v. *Anjell* holds as a matter of law that under those circumstances no one can ever be sentenced to a consecutive sentence. I think the record is clear as to what the court is doing and how it relied and considered on the various factors set forth in the probation officer's report, any other source, and as long as those reasons are clear and evidence to a reviewing court, a choice of a consecutive sentence would be appropriate."

The court then proceeded to note that under section 667.5 of the Penal Code, the robbery in question was not a violent felony and, therefore, the appellant could not be sentenced on the second enhancement. The new defense counsel then stated: "MR. ORENSTEIN: . . . I don't want to necessarily go over what Mr. Cole represented to the Court on Friday, but, of course, I am not privy with Judge Channell and what his—

"THE COURT: I realize that is a hearsay statement on my part and his.

"MR. ORENSTEIN: In any event, we are in the dark as to what factors existed in front of that Judge such that the sentencing was consecutive,

---

[4] In the *Anjell* case, the defendant was involved in two robberies while armed with a gun. The robberies took place approximately one hour apart. The trial judge imposed a consecutive sentence for the robberies and the case was remanded on appeal for resentence. The ground for the remand was the failure of the court to set forth its reasons for its sentencing choice as required by Penal Code section 1170, subdivision (c).

rather than concurrent. I don't believe—I concur in the Court's comments that I don't think the Court is precluded, of course, but rule 425 which lays out the judicial rules for consecutive sentencing, I don't think in any manner suggests that two robberies, such as we have here, due to the nature that it's not a 654 problem, mandates consecutive sentencing.

"THE COURT: Oh, no."

At this point, the court indicated that it was going to follow the probation recommendation. Defense counsel again indicated that his concern was with the consecutive sentence and argued that the court did not have the discretion to utilize the second Penal Code section 12022, subdivision (b), allegation under count II as a factor in aggravation when it was precluded from sentencing on it as an enhancement.

A dispute then arose as to whether or not the court could use the enhancing allegation of count II to aggravate the term in count I. The court then indicated that it had read and considered the probation report and the following sequence of events occurred.

The court then stated, "Am I correct the defendant, because of the nature of the violation is not eligible for probation? No, he is eligible." The district attorney then noted that appellant was eligible for probation because the weapon used was a knife. The court then proceeded to deny probation on the grounds that appellant was a threat to the community and on the facts of the case it would not be proper as a sentencing choice. The court selected count I as the principal term and set the midterm as the sentence with an additional one year for a violation of Penal Code section 12022, subdivision (b), and an additional year on count II consecutive to count I. With respect to the consecutive sentence, the court stated that it had considered factors in aggravation and mitigation pursuant to rule 425(b) and made the following statement: "I find that the circumstances in mitigation in this instance do not outweigh the circumstances in aggravation and, therefore, feel that as to 425(b), I have considered those and found that is the case." The court then proceeded to find that pursuant to rule 425(a)(1) the crimes were separate and, therefore, that factor was applicable. The court also found that rule 425(a)(2) was applicable in that the crimes were separate acts of violence. The court further found that rule 425(a)(3) was applicable and that the conduct was not so closely related as to constitute a single period of aberrant behavior. The court then made the following statement: "I think those are sufficient findings to support the reason why the court is imposing a separate consecutive sentence." The court then noted that it could not sentence for an additional enhancement on count II because it was not a violent felony within the meaning of Penal Code section 667.5.

Appellant's argument on appeal is directed to the fact that a conversation transpired between the sentencing judge and a judge of another jurisdiction on a matter then pending before the sentencing judge. Appellant contends that the conversation influenced Judge Azevedo to impose a consecutive sentence as was done in *Anjell, supra,* and points to the fact that the facts in *Anjell* are similar to the facts in the instant case. Appellant contends that this conversation was an ex parte conversation prohibited by canon 3A(4) of the California Code of Judicial Conduct, violated his rights to procedural due process as a matter of law and fact, constituted a violation of Penal Code section 1204, usurped his right to the independent discretion of the sentencing court and was a technical violation of the sentencing rules established by the California Rules of Court.

At the outset, the record does reflect that on June 10, 1983, the court indicated that the appellant was not eligible for probation (which, as we have noted, was an erroneous conclusion) and found that probation would be granted except for the fact that the appellant was statutorily ineligible. The court further indicated that it was striking the knife use (apparently the Pen. Code, § 12022, subd. (b), attached to count II) as a factor in aggravation. The record also reflects that the court on June 10 had taken no firm position on consecutive sentencing.

The record demonstrates that on June 13, 1983, the court found that appellant was not an appropriate candidate for probation even though he was eligible. This is inconsistent with the statement on June 10, 1983, that appellant would be granted probation except for statutory ineligibility. The court also determined that it could use the knife use as a factor in aggravation so long as it was not used to enhance and vacated its June 10 statement to the contrary. The court took a firm position and imposed a consecutive sentence.[5] The conversation with Judge Channell of Contra Costa took place, by the court's statement, subsequent to the first hearing and prior to the second hearing.

### SENTENCING ERROR

At the outset, our review of the factors stated by the sentencing judge to be used in support of the sentencing on the principal term and the reasons expressed in support of the consecutive sentence do not disclose any sentencing error. We further note that appellant cites no authority to this court in support of his contention that the factors expressed by the court as a basis for the consecutive sentence were improper. Appellant contends that the sentencing choice in the instant case was based on the use of the same facts,

---

[5]A consecutive sentence was also imposed in *Anjell* on substantially similar facts.

the knife use to aggravate and to impose a consecutive sentence. Section 1170, subdivision (b), of the Penal Code prohibits imposition of an upper term and a consecutive term based on the same enhancement. (*People* v. *Lawson* (1980) 107 Cal.App.3d 748 [165 Cal.Rptr. 764].) We note, however, that in the instant case *the midterm was imposed and not the upper term.*

In considering the existence of rule 425 factors to determine whether a consecutive sentence should be imposed, the court specifically found that "the circumstances in mitigation do not outweigh the circumstances in aggravation." As we interpret this statement, the court *did not* utilize any rule 421 criteria in aggravation as a reason to impose a consecutive sentence.

Therefore, we do not find any dual use of facts to support the consecutive sentence and we find no error in the sentence imposed on the basis of the reasons stated on the record.

### Canons of Judicial Ethics

■ Appellant argues that the contact between Judge Azevedo and Judge Channell violated a number of the canons of judicial ethics. Specifically, appellant points to canons 1, 2, 3 and 5 which basically deal with the duties of judges to refrain from conduct which would bring their impartiality into question. Appellant particularly addresses his attention to canon 3A(4). "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond." (Cal. Code of Jud. Conduct, canon 3A(4).)

Appellant contends that Judge Azevedo's conduct constituted an ex parte communication specifically precluded by the canons of judicial ethics and that the conduct tainted the subsequent sentencing.

The preamble to the Code of Judicial Conduct states, "[t]he administration of justice requires adherence by the judiciary to the highest ideals of personal and official conduct. . . . The Conference [Conference of California Judges] adopts this Code of Judicial Conduct as a proper guide and reminder for justices and judges of courts in California and for aspirants to *judicial* office, and as indicating what the people have a right to expect from them."

Counsel argues that the trial court deviated from accepted standards of judicial conduct but fails to adequately address in his argument the impact on his contentions of the commentary to canon 3A(4) of the California Code of Judicial Conduct. The commentary to canon 3A(4) states in pertinent part: "The proscription against communications concerning a proceeding includes communications from lawyers, law teachers, and other persons who are not participants in the proceeding, except to the limited extent permitted. *It does not preclude a judge from consulting with other judges, or with court personnel whose function is to aid the judge in carrying out his adjudicative responsibilities.*" (Italics added.)

A review of canon 3A(4) read in conjunction with the commentary to it clearly provides that the conduct of the trial court in the instant case was well within the contemplated parameters of the Code of Judicial Conduct. It is evident that the commentary recognizes the tremendous burdens placed on the trial judge by the volume of work. A judicial officer attempting to digest a record and prepare a decision in a matter of weeks would face, at a minimum, great difficulty in proceeding without a measure of assistance from either another judge or a law clerk. History and logic recognize the value of certain types of discussion between judges and, in our present society, the demands of the judicial function require it.

Trial judges are constitutionally required to render decisions in 90 days of their submission[6] and are under staggering burdens caused by a geometrically expanding caseload. They are expected, however, never to deviate from the standards of decision-making that reflect reasoned, informed and dispassionate conclusions. The mandates of judicial office dictate that the decision-making process is not a rush to judgment or a capricious or arbitrary judgment. A judge is expected to resolve matters in dispute in such a way so as not to impede the cause of justice. ". . . enlightened by intelligence and learning, controlled by sound principles of law, a firm courage combined with the calmness of a cool mind, free from partiality, not swayed by sympathy or warped by prejudice or moved by any kind of influence save alone the overwhelming passion to do that which is just." (*People* v. *Surplice* (1962) 203 Cal.App.2d 784, 791 [21 Cal.Rptr. 826].)

The commentaries to the canons of judicial conduct recognize, as we do, that discourse between judges such as occurred in the instant case is not inconsistent with public expectations of the decision-making process or erosive of public confidence in the judiciary. We find no basis for the conten-

---

[6]The Legislature shall prescribe compensation for judges of courts of record. A judge of a court of record may not receive the salary for the judicial office held by the judge while any cause before the judge remains pending and undetermined for 90 days after it has been submitted for decision. (Cal. Const., art. VI, § 19.)

tion that the letter of the canon or its spirit was violated by either the trial judge or the judge who was consulted.

## VIOLATION OF PENAL CODE SECTION 1204

■ Appellant contends that a discussion by the sentencing judge and a judge of another court in the instant case constituted a violation of Penal Code section 1204.[7] The portion of Penal Code section 1204 which is pertinent to our inquiry is "No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section."[8]

The Supreme Court has previously discussed the application of Penal Code section 1204 by saying: "Under sections 1203 and 1204, the sentencing judge may receive information upon which to base his decision in either (1) a probation report, which must be provided to the defendant at least two days before sentencing, or (2) a hearing in open court on aggravating or mitigating circumstances." (*In re Calhoun* (1976) 17 Cal.3d 75, 83 [130 Cal.Rptr. 139, 549 P.2d 1235].)

On the issue of what is acceptable to being received in open court on the issue of aggravation and mitigation, the court referred with approval to *People* v. *Neal* (1950) 97 Cal.App.2d 668 [218 P.2d 556] which states, "[s]ection 1204 requires the court in determining the consequences of guilt to receive *evidence* either in mitigation or aggravation of the punishment imposed." (*Id.*, at p. 676.)

In discussing the term "representation of any kind, verbal or written," to be received, as referred to in Penal Code section 1204, *People* v. *Sauer* (1945) 67 Cal.App.2d 664, 672 [155 Cal.Rptr. 55] provides guidance. In *Sauer,* there was a conversation in chambers between the court, defense counsel and the deputy district attorney at which the defendant was not

---

[7]Penal Code section 1204 reads as follows: "The circumstances shall be presented by the testimony of witnesses examined in open court, except that when a witness is so sick or infirm as to be unable to attend, his deposition may be taken by a magistrate of the county, out of court, upon such notice to the adverse party as the court may direct. No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section. This section shall not be construed to prohibit the filing of a written report by a defendant or defendant's counsel on behalf of a defendant if such a report presents a study of his background and personality and suggests a rehabilitation program. If such a report is submitted the prosecution or probation officer shall be permitted to reply to or to evaluate the program."

[8]Section 1203 deals with the duties of probation officers.

present. "It sufficiently appears that anything said in this conversation in the judge's chambers was not a 'representation . . . in aggravation or mitigation of the punishment' within the meaning of section 1204. In an abundance of caution the trial judge was merely attempting to make sure that no improper agreement had been made with the appellant in order to induce him to change his plea of not guilty to one of guilty. This went entirely to the legality of the plea and not to the kind of punishment that should be given. While the appellant's attorney again asked that he be given a jail sentence *this was merely an argument on his part and was not a representation of fact of any kind.*" (*Ibid.*, italics added.)

 It is, therefore, evident that the information the court may receive at a Penal Code section 1204 hearing is evidence which means, in essence, facts. "'Evidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.)

Relating a section 1204 hearing to a misdemeanor sentencing, the court in *People* v. *Giles* (1945) 70 Cal.App.2d Supp. 872 [161 P.2d 623] commented upon the receipt of facts outside of court with respect to a sentencing hearing by stating: "The fact that the [sentencing] hearing is not a trial in the full technical sense and is not governed by the same strict rules of procedure as a trial, does not mean, however, that the facts needed by the court to enable it to perform its duty may be picked up by the judge at the club or on the street. In *People* v. *O'Brien* (1932) 122 Cal.App. 147, 155 [9 P.2d 902, 905], we find this statement: 'Notwithstanding the fact that it has been decided that the hearing which may be conducted by the trial court for the purpose of determining the degree of the offense "is not a trial", nevertheless the only means by or through which the court is authorized to reach a conclusion in the matter is by the aid of evidence. . . .'" (*Id.*, at p. 880.) Thus, the court may not receive evidence outside of court that may be considered at a Penal Code section 1204 hearing.

Further, the receipt of facts outside of court with which the accused was not confronted would raise serious constitutional issues. "Such a procedure undermines the rationale of extending the defendant's protections: to guard against the inadvertent use of misinformation and to ensure the defendant an adequate opportunity to present his claims . . . ." (*In re Calhoun, supra,* 17 Cal.3d 75, 84.) Reserving for later discussion within the text of this opinion the appellant's due process arguments with respect to the conversations at issue herein, the record does not support, nor is it reasonably susceptible of, any inference that the trial court received any evidence from another judge for any purpose. It is evident that the determination of what is the law is not evidence but, rather, a determination of the legal principles

to be applied to evidence. Thus, a discussion between judges as to the law applicable in the case before one of them and even the application of the law to the facts would not fall within the prohibitions of Penal Code section 1204.

We, therefore, find appellant's argument concerning a violation of Penal Code section 1204 to be without merit.

PROCEDURAL DUE PROCESS ISSUE

 In essence, it is the contention of appellant that contact between judges to discuss a matter then pending before one of them violates the principles of procedural due process and denies the accused a fair and impartial tribunal. Appellant argues that contact between judges for consultation on a pending matter taints the assigned judge and, since neither the accused nor his counsel is present, denies the accused the right to an opportunity to be heard in response to the statements of the consulted judge. Appellant further argues that for a judge to consult with another judge on a sentencing issue, as was done in this case, deprives the accused of the opportunity to be sentenced by an impartial judge or, at the very least, creates such an appearance of partiality that it is error for the judge who has sought advice to sentence.

At the outset, we would note that Judge Azevedo stated on the record that he had consulted with Judge Channell on the application of *People* v. *Anjell, supra*, 100 Cal.App.3d 189. The record, therefore, clearly discloses that all parties were given notice that Judge Channell had been consulted. The record further clearly reveals that all parties were given an opportunity to respond to the court's statements. Appellant contends, however, that the notice was insufficient to disclose all aspects of the conversation with Judge Channell and the extent to which the conversation influenced the subsequent sentencing decision of Judge Azevedo. The ultimate argument of counsel, in effect, is that judges must not engage in ex parte communications with one another on pending matters and to do so is a violation of the defendant's procedural due process rights.

 " 'What is due process depends on circumstances. It varies with the subject matter and the necessities of the situation. [Citation.] Its content is a function of many variables, including the nature of the right affected, the degree of danger caused by the proscribed condition or activity, and the availability of prompt remedial measures.' " (*Thorn* v. *Superior Court* (1970) 1 Cal.3d 666, 673 [83 Cal.Rptr. 600, 464 P.2d 56], quoting *Sokol* v. *Public Utilities Com.* (1966) 65 Cal.2d 247 [53 Cal.Rptr. 673, 418 P.2d 265].)

The gravamen of appellant's argument is that there was a change in the tone and direction of sentencing between the first hearing and the second. Appellant infers that Judge Azevedo's statement concerning his conversation with Judge Channell implies that Judge Azevedo engaged in a discussion of the law with regard to the case and, of necessity, a discussion of the facts, which appellant infers from the denial of probation and the consecutive sentence that he contends were not necessarily contemplated in the first hearing. It is appellant's position that the conversation denied him the opportunity to be heard on the subject of Judge Channell's interpretations and influenced Judge Azevedo to the extent that appellant was denied a fair and impartial tribunal in fact and as a matter of law.

■ "[T]he State owes to each individual that process which, in light of the values of a free society can be characterized as due." (*Boddie* v. *Connecticut* (1971) 401 U.S. 371, 380 [28 L.Ed.2d 113, 120, 91 S.Ct. 780].)

Whether any procedural protections are due depends on the extent to which the defendant will be condemned to suffer grievous loss. (*Anti-Fascist Committee* v. *McGrath* (1951) 341 U.S. 123, 168 [95 L.Ed. 817, 852, 71 S.Ct. 624]; *Morrissey* v. *Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593].) ■ "Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. ■ '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' [Citation.] ■ To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." (*Ibid.*)

In *People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622], the court noted, "the extent to which due process relief will be available depends on a careful and clearly articulated balancing of the interests at stake in each context." (*Id.*, at p. 269.)

■ *Ramirez, supra,* sets forth the criteria that must be considered to determine whether due process dictates must be met and whether they are, in fact, being met by the procedures utilized: "(1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value,

if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." (*Ibid.*)

### 1. *The Private Interest Affected*

██ It is fundamental to due process that an individual be accorded "the fullest opportunity to preserve his rights and defend against the charges . . . ." (*People* v. *Whittington* (1977) 74 Cal.App.3d 806, 820 [141 Cal.Rptr. 742].) It is also fundamental to due process that "when an individual is subjected to deprivatory governmental action, he always has a due process liberty interest both in fair and unprejudiced decision-making and in being treated with respect and dignity." (*People* v. *Ramirez, supra,* 25 Cal.3d at p. 268.)

Article I, section 15 of the California Constitution provides: "Persons may not twice be put in jeopardy for the same offense, be compelled in a criminal cause to be a witness against themselves, or be deprived of life, liberty, or property without due process of law."

██ It is evident that in a sentencing hearing the defendant's liberty is at stake and due process considerations apply. In the instant case, the private interests of the litigant are the right to be heard to the extent necessary to place all facts and issues before the court and the right to an impartial judge. The defendant's right to be heard is designed to ". . . guard against the inadvertent use of misinformation and to insure the defendant an adequate opportunity to present his claims . . . ." (*In re Calhoun, supra,* 17 Cal.3d 75, 84.) The reasons for an impartial tribunal are so basic and so rooted in our societal expectations of justice that they do not need an explanation of purpose or justification.

██ We therefore find that the appellant has a private interest that gives rise to procedural due process protections. The issue remains, however, as to what extent, if any, due process protections prohibit communication between judges on a matter pending before one of them.

### 2. *The Risk of an Erroneous Deprivation of Private Interest (Right to Be Heard in a Fair Tribunal) Through the Procedures Used and the Probable Value of Additional or Substitute Safeguards*

██ With respect to communications between judges, the risk that the defendant will be erroneously deprived in fact of his interest in being heard

and having an impartial tribunal is minimal in light of the safeguards and procedures in place. A defendant may file a motion pursuant to Code of Civil Procedure section 170.6 prior to the proceeding if he has any reason to believe that the trial judge is not fair and impartial. We note that such was not done in the instant case. A defendant may file a motion pursuant to Code of Civil Procedure section 170, subdivision (c), alleging actual bias which the judge is obligated to respond to or disqualify himself. Such a motion was not filed in the instant case.[9] A judge is obligated to disqualify himself if he has an actual bias. (Code Civ. Proc., §§ 170, subd. (d), and 170.6.)

██ Appellant contends that a discussion between judges of the facts of a matter pending before one of the judges deprives him of the opportunity to be heard. Appellant fails to indicate how he is deprived of an opportunity to be heard as it applies to the context of a conversation between judges. In that context, the facts are not presented by an interested party but, rather, by the judge before whom the matter is pending. Further, the judge is obligated not to receive evidence outside the record (see Pen. Code, § 1204 and discussion herein). Thus, the statement of facts made to another judge does not come from outside the record and the other judge is not a person interested in the outcome in the sense of a litigant or an individual who is not obligated to view the matter without bias.[10]

While counsel goes to great lengths to infer from this record that facts were discussed as opposed to a purely legal question, there is nothing in this record to support the implication that the trial court received any evidence in the conversation with Judge Channell or that the court considered any facts outside the record. If anything, the only inference that may be drawn from the statement on the record is that Judge Azevedo would have presented the facts as he perceived them to be. Since Judge Azevedo is, in fact, the trier of fact, we fail to see how his recitation of the facts to another judge could constitute an improper influence upon him.[11]

---

[9]Appellant contends that if Judge Channell played a role in his sentencing, then he should have had the right to use the provisions of section 170.6 of the Code of Civil Procedure upon Judge Channell. Judge Channell did not "*try or hear*" any portion of the sentencing hearing; Code of Civil Procedure section 170.6 is, therefore, not applicable.

[10]Counsel contends that he has a right to a judge "untouched by secret communications from a person with a stake in the ruling." There is nothing in the record to indicate that Judge Channell had any "stake" in the ruling.

[11]Appellant contends that since Judge Channell presumably advised Judge Azevedo on appellant's sentencing, he should have been allowed to testify before Judge Channell. This argument is without merit legally or factually. As has been determined in the later body of this opinion on the use of independent discretion, the sentencing was the product of the independent discretion of Judge Azevedo and there is nothing in the record which is susceptible of the inference that the appellant did not have the opportunity to testify. *Brooks* v. *Tennessee* (1972) 406 U.S. 605 [32 L.Ed.2d 358, 92 S.Ct. 1891] is not in point.

With respect to legal discussions between judges concerning a matter pending before one of them, it is evident that the determination of what is the law is not evidence but, rather, the legal principle to be applied to evidence. Assuming, arguendo, that the discussion between judges generated a new theory of the case, the court would be obligated to disclose that theory to the parties. "Elementary principles of due process support our conclusion that if, during a trial, the court, *sua sponte,* unearths a point of law which it deems to be decisive of the cause, the party against whom the decision impends has the same right to be heard before the decision is announced that he has to produce evidence upon the issues of fact. Denial of that opportunity deprived defendant of a substantial right to which it was entitled by virtue of the guarantee of due process." (*Moore* v. *California Minerals etc. Corp.* (1953) 115 Cal.App.2d 834, 837 [252 P.2d 1005].)

Further, with respect to the application of the law to the case, the legal reasoning is disclosed in the result. The proper legal reasoning or the lack of same can be inferred from the conclusion to which the parties have an opportunity to respond. It is important to bear in mind that the accused has ". . . no vested right to perpetuation of error merely because it is to his benefit." (*In re Jonathan S.* (1979) 88 Cal.App.3d 468, 472 [151 Cal.Rptr. 810].)[12]

It should be noted that if procedural due process prohibited conversations between judges in the context we have discussed, then conversations between judges and law clerks would also fall within the same prohibition. More importantly, as has been observed with any of the procedures discussed herein and even with a total prohibition on communications by the judge with other judges or court personnel, the enforcer of the prohibition and the person who would determine its violation is the judge himself. Additional safeguards or other safeguards would not change the fact that it is the hearing judge who must determine if he has a *bias in fact.* Since the hearing judge is the party who must make the determination of the existence of a bias in himself, all that any regulation can do is provide guidance for him. Therefore, the present safeguards provide sufficient guidance for the hearing judge to assess his own impartiality. There is a presumption in the honesty and integrity of our judicial officers. (*Withrow* v. *Larkin* (1975) 421 U.S. 35, 47 [43 L.Ed.2d 712, 723, 95 S.Ct. 1456].)

---

[12]Appellant argues that since he was not present during the discussion between Judge Azevedo and Judge Channell, he is denied the opportunity to confront any comment adverse to his interests. As we have indicated, he has an opportunity to confront legal issues and there is no indication that Judge Azevedo received any facts from Judge Channell which appellant should be confronted with. Appellant also cites *Brookhart* v. *Janis* (1966) 384 U.S. 1 [16 L.Ed.2d 314, 86 S.Ct. 1245] for the right to confront Judge Channell by cross-examination. As we have indicated, there was nothing to confront.

██ With respect to the second prong of *Ramirez, supra,* the present procedures provide minimal risk of a judge hearing a case wherein he harbors actual bias. In any event, in the final analysis, we must depend upon the integrity of the judge to reject that which he may not consider. The circumstance is really not that much different from our expectations of a judge who, in a court trial, must exclude a confession and then proceed to determine a question of guilt or innocence.

We find that communication between judges does not pose such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. (See *Withrow* v. *Larkin, supra,* 421 U.S. 35, 47 [43 L.Ed.2d 712, 723].)

3. ██ *Dignitary Interests of the Individual in the Nature, Grounds and Consequences*

Communication between judges is entirely distinct from ex parte communication with judges by parties to the action. Individuals who carry with them the bias of advocacy do not, and most probably cannot, separate their interests on behalf of their client in a favorable result from the court's interest in a just result no matter whom it favors. Thus, the dignitary interests of the individual are affected by the perception of deprivation of opportunity to be heard and the existence of bias. The dignitary requirements of procedural due process dictate that not just bias in fact but the appearance of bias and impropriety are due process considerations. ██ "A fair trial in a fair tribunal is a basic requirement of due process. ██ Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. ██ This Court has said, however, that 'every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.' *Tumey* v. *Ohio,* 273 U.S. 510, 532. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. ██ *But to perform its high function in the best way 'justice must satisfy the appearance of justice.'"* (*In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 946, 75 S.Ct. 623], italics added.)

██ If it were to appear that the court was, in fact, being influenced, whether such was in fact the case, the appearance of a fair tribunal is shadowed by the spectre of bias.

The real issue raised by appellant's due process argument lies in the appearance of fairness. We accept the argument that judges must police their own emotions and biases and we, of necessity, depend upon them to do that. As alluded to in *Murchison, supra,* it is the appearance of impropriety, the possibility of bias, that we guard against.

Is there the appearance of impropriety in discussion between judges in order to aid the decision-making process? Whether we talk of the great debates within the House of Lords or the dissents of Holmes addressing the contentions of his brethren, do we really believe the decision-making process is so formal and rigid as to be reduced to correspondence written or uttered for the record?

In assessing the propriety of conversation between judges on a matter then pending before one of them, consideration should be given to whether or not the practice offends some principle of justice so rooted in the traditions and expectations of our society to be ranked as fundamental in nature. (*McKeiver* v. *Pennsylvania* (1971) 403 U.S. 528, 548 [29 L.Ed.2d 647, 662, 91 S.Ct. 1976]; *Leland* v. *Oregon* (1952) 343 U.S. 790, 798 [96 L.Ed. 1302, 1308, 72 S.Ct. 1002].)

What is "the appearance of fairness" which is the essence of the individual's dignitary interest expressed in the due process analysis of *Ramirez, supra?* " 'For government to dispose of a person's significant interests without offering him a chance to be heard is to risk treating him as a nonperson, an object, rather than a respected participating citizen.' [Citation.] Thus, even in cases in which the decision-making procedure will not alter the outcome of governmental action, due process may nevertheless require that certain procedural protections be granted the individual in order to protect important dignitary values, or, in other words, 'to insure that the method of interaction itself is fair in terms of what are perceived as minimum standards of political accountability—of modes of interaction which express a collective judgment that human beings are important in their own right, and that they must be treated with understanding, respect, and even compassion.' " (*People* v. *Ramirez, supra,* 25 Cal.3d at pp. 267-268, quoting Saphire, *Specifying Due Process Values* (1978) 127 U.Pa.L.Rev. 111, 159.)
Thus, in serving the dignitary interests of the individual it is not just fairness in fact that is a goal but also the individual's reasonable belief that the proceedings are fair.

*Ramirez* specifically notes as a due process criterion that the individual has a dignitary interest in being informed of the nature, grounds, and consequences of the action and in being able to present his side of the story before a responsible public official. (See *Ramirez, supra,* at p. 269.)

 In the instant case, the record amply reflects that appellant was informed of the nature, grounds and consequences of the action he was named in. The record also reflects that appellant had an opportunity to present his "story." Again, however, in considering the propriety of the conduct in the instant case, reference must be made to the "responsibility" of the judicial officer presiding. Thus, the dignitary interest of the individual recognizes that there must be confidence in the honesty and integrity of the judge and in his proper performance of his judicial functions. There is nothing before us that raises any reasonable question as to the appearance of fairness in these proceedings. The record does not place the judge's actions in question.

We therefore find that the conduct in the instant case comports with the appearance of fairness essential to due process and our basic conceptions of justice.

### 4. *The Governmental Interest in the Function Involved*

The governmental interest is the same as a litigant's interest—having fair, knowledgeable and impartial judicial officers presiding over disputed matters. To deprive judges of the opportunity to discuss cases with their colleagues in the context we have discussed would, as previously noted, not add to or detract from fairness or impartiality in fact. However, to prohibit contact between judges on pending matters would be adverse to governmental interests in a knowledgeable judiciary and facilitating the judiciary's ability to exercise its discretion wisely. If anything, we perceive that governmental interests would be impeded by a prohibition against discussion, in the context we have noted, between judges.

For the reasons aforementioned, we find no procedural due process deprivation in a discussion between judges in the context that we have indicated herein.

### INDEPENDENT DISCRETION OF THE COURT

 Counsel contends that it can reasonably be inferred that the sentencing in the instant case was really Judge Channell's sentence simply repeated by Judge Azevedo without any discretion being utilized by Judge Azevedo. "It is well established in the law that the severity of the sentence and the placing of defendant on probation rest in the sound discretion of the trial court. [Citation.] It also is fundamental that the law contemplates an exercise of that discretion by the sentencing judge and in the absence of such exercise there has been no lawfully imposed sentence." (*People* v. *Surplice, supra,* 203 Cal.App.2d 784, 791.) The record

in the instant case does not demonstrate, even remotely, that Judge Azevedo did not use his independent discretion in sentencing appellant.[13] ■ The term independent discretion means the use by the judicial officer of his own judgment arrived at after a careful consideration of all the evidence before him in the light of the law applicable to the case. ■ "Judicial discretion is that power of decision exercised to the necessary end of awarding justice based upon reason and law but for which decision there is no special governing statute or rule. Discretion implies that in the absence of positive law or fixed rule the judge is to decide a question by his view of expediency or of the demand of equity and justice. [Citation.] The term implies absence of arbitrary determination, capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason." (*Surplice, supra,* 203 Cal.App.2d at p. 791.)

■ The essence of the rule mandating independent discretion is that the ultimate decision must be made by the judge himself. ■ We fail to see how conversation that relates to legal criteria, sentencing criteria, and legal questions interferes with the independent decision-making process. While we rest our conclusion in principal upon the legal presumption that official duties have been regularly performed,[14] the foundation of our conclusion stands upon the fact that the conversation in the instant case did not extend beyond legal criteria, guidelines, or legal advice in order to facilitate the independent decision-making process rather than to replace it.

Judges are mandated to use their independent judgment in sentencing and we depend upon them to meet that obligation. Absent an acknowledgment on the record or the record itself disclosing a failure of independent judgment, we must rely upon the integrity of the judge to meet his or her obligations. The record herein amply demonstrates that Judge Azevedo did what is expected of him and every other judge. We find no merit in appellant's argument that there was an abandonment of discretion in the instant case.

## CONCLUSION

This case presents issues of great sensitivity and involves constitutional questions and precedents that bring into play a host of critical considerations. Appellant has raised questions that go to the heart of the judicial function. The judicial robe is a mantle of responsibility that entrusts an

---

[13]Since we have found that the facts support the clear inference that the trial court exercised its independent judgment, we do not find it necessary to address appellant's argument concerning *People* v. *Arbuckle* (1978) 22 Cal.3d 749 [150 Cal.Rptr. 778, 587 P.2d 220, 3 A.L.R.4th 1171] in that the facts do not support its application.

[14]Evidence Code section 664 states in pertinent part: "It is presumed that official duty has been regularly performed. . . ."

individual with the most sacred obligations that our society can impose—the protection of each citizen's rights in a neutral forum. The acceptance of the judicial function does not confer greater wisdom upon the individual but only greater responsibility. In carrying out that responsibility, judges must search their own minds and hearts in making decisions but they cannot do this without the benefit of the counsel they find in their brethren—this is so for the lowest magistrate and the highest court.

The judgment is affirmed.

Franson, Acting P. J., and Hamlin, J., concurred.

On October 23, 1984, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied January 2, 1985.